Plaintiffs in this case, the members of the Rahbarian family, on this appeal from a summary judgment motion or summary judgment ruling, the plaintiffs, the Rahbarians from the family, filed a civil rights action because the defendant DMV agents acted essentially as private collection agents instead of as independent law enforcement agents obtaining and executing a search warrant of their homes and their residences. The district court granted improperly, in our view, the summary judgment motion, finding that Exhibit A to the search warrant, which defined the scope of the warrant, was essentially irrelevant, and that plaintiff's evidence of improper motive and judicial deception by the defendants, as a matter of law, did not establish a deliberate or reckless false statement or excuse for purposes. What happened with Exhibit A is to get it ended up missing, but it's not missing from our side of the case, the plaintiffs have copies of Exhibit A because they have copies of the search warrant that the DMV agents served on them when they raided their homes and their businesses. And their copy of the search warrant shows 19 specific vehicles attached to it. They're being the plaintiffs. They're being the plaintiffs. And not only the search warrant issued by DMV had left at multiple locations, but also a search warrant that the DMV agents cooperated in that was executed in Washington State, which included the identical 19 vehicles attached as Exhibit A. The only people who are missing Exhibit A to the search warrant are the defendants. And that's all of the, every single copy of the search warrant in the defendant's possession is missing Exhibit A. And the copy that was in the Superior Court's file mysteriously was missing Exhibit A after Defendant Coley and another agent went and checked out the file, looked at it at the courthouse, and supposedly to look for a fresh copy of the warrant. And afterwards, the Exhibit A disappeared. It was also, what significance does it have, if any? Has there been adverse inference here, looking at it? It has significance in a number of different ways. The most direct significance is on the question of whether there was probable cause for the warrant, and whether or not the defendants deceived the magistrate by suing Exhibit A for the Exhibit A that you have. What's the exact reason? Well, the 19 vehicles that were listed were all repossessed by brashers, so they weren't missing and they weren't embezzled. If the magistrate had known that the subject of the search, the 19 vehicles that were identified, had all been repossessed, they weren't missing, there wasn't any money missing with respect to them, it's very likely that he wouldn't have authorized the search of five residences. So that's at least something that should have been for them, something that was certainly material for the magistrate to know. So when you look at the warrant itself, the way the DMV defined it, they defined the embezzlement as the riparian's business of sludgery, imports, and peerless car rentals, and I'm quoting here, deposition of vehicles from brashers, pursuant to contract, and failed to remit any funds after disposing of the vehicles in violation of Penal Code Section 504A. Well, the correct exhibit A proves that both of those things are wrong. First of all, the riparians, their businesses didn't dispose of those 19 vehicles, they were sitting on the lot when brashers repossessed them, and second of all, there was no failure to remit funds because they weren't doing it, their cars hadn't been sold, so there were no missing funds. That, I submit, is a critical factor for a magistrate to consider in deciding whether or not there was probable cause. Going on, there's a second problem. Even if the vehicles, even if there had been more vehicles here than the 19 that were listed, and I don't think there should be a 15 where you should stop right there at those 19 vehicles, because the whole purpose of a warrant is to define what the scope of the search was and to identify that with particularity, and you can't just change your mind about what it is you're looking for after you've completed the search and say, oh, I didn't really mean to abuse specific 19 vehicles, I meant something else. That turns the whole search into the general warrant that basically led to the Fourth Amendment in the first place when British troops were breaking into houses looking for whatever they wanted to look for. But even going beyond that, even assuming that there were more than those 19 vehicles there, the district court erred in ignoring the plaintiff's evidence that there was improper motive here by the DUV agents, and that they ignored and failed to disclose critical evidence in the search warrant in addition to the fact that those specific 19 vehicles were repossessed. For one thing, the district court at one point recognized that there was circumstantial evidence that the DMV agents had an improper motive because their own tape recordings show them telling Brashers, the president of the large Sacramento auto auction firm that informally filed this complaint, that they hoped that by pursuing the criminal charges against the riparians, it would encourage them to settle with Brashers. There's another conversation in which they basically lifted up to Brashers on whether or not he wanted them to prosecute Commie or Soltani, who's the real bad guy behind this and who caused all these losses. And if you go beyond that, if you look at the omissions, and I won't bore the court by restating everything that's in the briefs, but the district court concluded that it showed at most a sloppy investigation. But if you look at it, it's not actually a sloppy investigation. These weren't haphazard or random omissions. They were all omissions of facts that were consistent with the fact that the DMV agents were taking Brashers' word for everything, ignoring everything that was contrary to that, not doing any independent investigation in those six months, and then just presenting to the magistrate under the guise of an investigation, suggesting that they had reviewed financial records. The bigger allegations that Brashers made, the most important of those is the fact that Luxury Imports had actually tendered checks for almost all of the vehicles that Brashers claimed were on bail. I don't understand. Why do you mean tendered checks? Delivered checks. Excuse me. They sent them checks. Or they delivered checks to who? They delivered checks to Brashers, and Brashers decided to hold them. And the reason they decided to hold them was because they also had a line of credit to licensed dealership, and they preferred to pay off his debt first and let interest accumulate on the ones that were secured by the rebarriants, because they figured the rebarriants had enough money to pay it off. So there was no failure to remit. It was just Brashers held onto checks until Luxury Imports filed bankruptcy, and then the checks became worthless. Do you have any idea of the dates the checks were delivered on the day of bankruptcy? The bankruptcy was in July 2007. The checks Brashers held for some of them for over a year. So it ranged for the vehicles from over a year to a couple of months before the bankruptcy happened. There was no information given to the court that Brashers had been paying for the vehicles? No. There could be claims that they didn't know it, but Brashers itself gave the documentation to the Deputy Attorney General who was supposedly supervising the investigation. So, I mean, if the DMV agents didn't look at what their complaining witness handled, and their Deputy Attorney General, that in and of itself is recklessness at least. If there's no questions, I'd like to save a minute and a half left. Thank you. May it please the Court. James Walter for Appellees, Smallwood and Cauley. The issue before this Court is whether there was sufficient evidence presented to the District Court to justify Judge Nunley's ruling that summary judgment was appropriate. Thank you. I find this very bizarre and odd. It's one of the most controversial instances. Exhibited in default conditions, represented as being an exhibit to the plaintiffs themselves. But that in and of itself is really strange. But the second strange thing, there seems to be no representation of the fact that the plaintiffs got, in fact, paid off the lawsuits against the plaintiffs. By text, they had given it to Brasher and that would have invalidated most of the claims. I guess that seems to have nothing to do with Brasher or Nunley. Counsel says that the Attorney General's Office and the District, the Senate and all these other vessels, were free to pay things that had been paid and that were being held by Brasher. Is that correct? No, Your Honor, it isn't. The evidence in the record shows that the checks that were delivered to Deputy Attorney General Robert Morgenstern, who was one of our criminal deputies, consisted of checks that were tendered, but the Brashers was told not to cash them because there was insufficient funds. They were told to hold them and hopefully later they could pay them. Here is, in counsel's objections to the evidence, it's between pages 22 and 39 in the record. There's a quotation from a declaration submitted. This was submitted by Appellant's counsel, Cy Resolve. After the hearing on the motion for summary judgment, there's a one-paragraph statement from the declarant stating, I was given checks, this was a Brasher's employee, and told not to cash them. Those were the checks that were delivered to Brashers. The evidence that Colley and Smallwood were aware of did not include them when they applied for the warrants. They did discuss with Mr. Morgenstern what they were seeking, but there was no indication in the conversation about those particular checks that occurred. And the other fact about these checks is that there's nothing in the record indicating what they were. There were notations listed and some initials, CK. However, there's nothing in the record to show what these checks were for. So, I think you did get it correct. That includes the four good cars assessed, if you believe the central court affidavit or any law, that he based the part on the fact that those cars had not been damaged by weapons. Is that correct? Our position is that the affidavits, in this case, submitted a declaration with all 132 April's flags. I understand the evidence. He put the car in his hand and it was, and he was going to exempt the affidavit, and he said that he possessed the affidavit, and he was going to bring it to us. Objection, that makes the decision correct. Those cars did not get sold. The five never did. Some had been sold. One, the title that had been transferred, one of the cars that was actually recovered, title that had been transferred to Payless Auto Sales, owned by another of the Reverend's family. Other cars on the warrant, they did discuss, some that had been recovered and some that had been sold. The affidavit stated that 173 of the 192 vehicles had been sold to third parties. They had verified that with their DMV records, in this case. I'm anticipating that. Yes, yes. So the 19 cars that were listed in the affidavit, that he did, those 19, the four are just here on the warrant, and those four were repossessed private clients. There's no evidence they had been sold, or received, to be found in the affidavit. I believe that is correct, Your Honor. The evidence. Do you agree that, in looking at these videos, that your clause said that we used the warrant inquiry just for the 19 vehicles? No, Your Honor. If you look at item four in the search warrant, the judge, Judge Ransom, the second prosecutor in court, authorized the agents to search and seize any and all financial records pertaining to all the adult accountants. And what date was this? Page 698, Your Honor. Page 698 in the record. 698. Go ahead. Which part of it? Paragraph four. Copies of all financial statements, or any other banking record, in the names of Payman Reverian, Shane Reverian, Mike Reverian, Tamir Soltani, Vera Davidenko, Luxury Enforced Sacramento, Incorporated, DBA, Suzuki of Sacramento. Post Hermanos Auto Plaza, Auto Mundo, and Payless Car Records. That's correct, Your Honor. Now, the general search, the search is based on a setting that's related to 19 cars, and four of which are disguised. They are on page 564 of the search warrant. And that one. Your Honor, I believe that the search warrant was based on the entire affidavit, including the 173 pin numbers that were produced by the affidavit to Judge Ransom. And Judge Ransom reviewed all evidences that Judge Ransom reviewed this thoroughly before he issued the warrant. He was aware that they were looking for records of embezzlement, not a subject of recovery in the cars, or the titles of the cars. Records of embezzlement. I would bet you that the cars have been sold. But the affidavit discusses 173 other vehicles that had been sold to third parties. But the affidavit discusses the other 173 cars. Seconds. They say that a specific install and transfer of the totals of the 92 leased vehicles to any of the four vehicles. In the same manner, information relating to the 16,000 was actually added to the directory. It can't be found in the affidavits. The affidavits, according to me, were not informed that anything would happen to these other vehicles. It's contained within the city of Randolph, which is active today. This is information relating to the 16,000 vehicles found today, and no such information could be found in the attachment. I can see that the Exhibit A that has survived to this date doesn't list the 173 other vehicles. I have no argument on that. But we do believe that it was produced and that Jeff Ransom reviewed the entire thing. Had he not been told of the other 92 vehicles, it makes no sense that he would have continued conversing about this issue. So that he was told that the position of the other side was they had, in fact, received some different types of tax dollars for these vehicles. Jack said everything was fine. This is him, by the way. Yes. And I'm just going to read what side says that the tax had been delivered. The other side apparently says that the tax was delivered, but we were told not to tax it. None of this information was provided to the legislature. That's because the investigators, Smallwood and Cawley, did not have that information when they applied for the warrants. They asked if they had any kind of evaluation. What kind of an investigation? They didn't know if the tax had been paid for all these cars? No, they did not. They interviewed several employees of both Rousers and of Suzuki of Sacramento. They learned conflicting details. They were told that they were a debit decoder that paid $140,000 shortly before the Rivarians had filed bankruptcy. Suzuki did this. And they were aware of many missing vehicles under a process where vehicles were driven onto the lots. When people from Rousers were expected to examine the lot and see if vehicles had been sold, those vehicles had, in fact, been sold to third parties. There was evidence of transactions like that. And there's still a case that the legislature took. I think it was eight years. We had received a check for us in the United States, which the judge was not advised of. And there was no information. And all of the information you're giving us about the other cars is not No, it isn't, Your Honor. It's our position that the case in the apartment park, that the Pantheons had sufficient evidence to justify a fair probability that evidence that it doesn't have would be found. Thank you. Thank you. I've got five minutes and a half left, so let me try to respond to some of that. First of all, the search warrant itself, right on the introduction, where it describes what property is to be seized, describes it as evidence related to theft or embezzlement,  or possession of a property that is not owned by the owner. And then it says, it describes it as evidence related to possession or subsequent transfer of the vehicles listed in Attachment A. So Judge Ransom, when he looked at the warrant, if you looked at the same Exhibit A, we looked at 19 cars. And he was not told that those 19 cars had been repossessed and that there was no money due on them. So the second point is the court asked a question about the four cars specifically mentioned in the search warrant affidavit. There is not a perfect overlap between those cars and what's in Exhibit A. So some of those cars were cars that had been sold. But contrary to what my colleague says here, there is evidence in the record relating to those specific four cars that there were checks tendered, checks given to crashers to pay for those cars. And it's in the declaration of your affidavit call that was submitted in opposition to the summary judgment motion. And it goes through the history of each one of the four vehicles that are listed in the search warrant affidavit and shows that for each one of them there was a check that crashers was holding. Now, my colleague says, well, somebody at crashers was told not to cash those checks. Best case, that's a disputed issue of fact. That doesn't get you summary judgment. Worst case, it's not true, and it's not true because crashers was cashing other checks at that time, and the information running as unlicensed dealership through crashers had accumulated. So they were choosing which checks to cash and which ones not to cash. Certainly, at a minimum, that information should have been disclosed to the magistrate when he was presented with this search warrant affidavit. If there are no other questions. Thank you. Thank you very much, Your Honor. Thank you both.
judges: Reinhardt, Tashima, Molloy